...CT COURT
                                                        ...CT OF MASS.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIS A. PEDRAZA,<br>Plaintiff<br><br>v.<br><br>HOLIDAY HOUSEWARES, INC.,<br>DOUGLAS BINGHAM,<br>MARCO ARGUILLA, CINDY MOHAN,<br>WILLIAM SAKKINEN &<br>DENNIS DeMUELLE,<br>Defendants | 2000 DEC 21  A 11: 52<br><br>Civil Action No. 99-40030-NMG<br>...CLERK'S OFFICE<br><br>**PLAINTIFF'S RULE 37<br>MOTION TO COMPEL<br>ANSWER TO INTERROGATORIES<br>IN ORDER TO BE ABLE TO<br>CALCULATE PUNITIVE DAMAGES** |

**What Plaintiff Seeks:**

Plaintiff in the above-captioned matter hereby respectfully moves pursuant to F.R.Civ.P. 37 and Local Rule 37.1 to compel each defendant to answer the following interrogatory propounded by plaintiff:

1.  "Please identify the amount of your income as reported on state and federal income tax returns including all schedules and W-2 forms for the following years: 1995 to the present."

On November 16, 2000, defense counsel Joseph P. McConnell replied as follows:

<u>Answer</u>

"Defendants object to each of these identical interrogatories served on each defendant because they are irrelevant, overly broad, unduly burdensome, and not otherwise calculated to lead (sic.) the discovery of relevant information. Defendants further object to these interrogatories because they seeks (sic.) private information about parties that is not in any manner relevant to this action and are designed merely to be vexatious and harassing of the individual defendants. Defendants further object to these interrogatories because they (sic.) vague and ambiguous since Defendant Holiday Housewares, Inc. is not an employee of any entity that subject it to received (sic.)an I.R.S. Form W-2."

30-1

# Facts

This Title VII case of sexual discrimination stems from an employment relationship between Plaintiff Luis Pedraza and defendant Holiday Housewares (hereafter "Holiday"). Pedraza was hired as a temporary worker to work in the shipping department on or about 1995, loading and unloading material. That plaintiff suffered violations of Title VII (a section explicitly providing for punitive damages) at the hands of these Holiday employees appears clear from the record.

<u>Testimony of Co-workers corroborate plaintiff's allegations:</u>

**[Deposition Testimony of Gretchen Rodriguez at p 12, line 16 through p. 13, line 8]**
Q      Do you remember at some point in time that people at HH, employees, began spreading rumors that Luis was gay; is that correct/
A      Yes
Q      Who began spreading rumors that Luis was gay?
A      I have to say a name?
Q      Yes. Roger Freeman?
A      I don't know.
Q      Who else said that Luis was gay?
A      I don't know. Scott – I don't know his last name.
Q      What about Ronald Mansfield?
A      Ronald, yes, Ronald.
Q      And Ronald also said that Luis was gay?
A      Yes, Ronald, he worked at shipping, right.

**[Id. at p. 13 line 21 through p. 14 line 2]**
Q      You heard Roger Freeman say that Luis was gay?
A      Yes
Q      And Ronald Mansfield?
A      Ronald, yes.

**[Id. at p. 14 line 20 through p. 17 line 21]**
Q      Well do you remember one time when Ronald Mansfield, one time you were with Ronald, and Bill was there, you were there, and Suma was there and Ronald Mansfield began making comments that were –Ronald Mansfield began calling Suma a "fucking Puerto Rican?"
A      Yes
Q      You remember that?

A   He told me too.
Q   That you were a fucking Puerto Rican?
A   Um hum.
Q   And how did that make you feel?
A   It's bad. I feel bad.
Q   It made you cry like it's making you cry now?
A   Yes.
Q   Why did he call you a fucking Puerto Rican?
A   I don't know.
Q   Did he say that all Puerto Ricans were drug addicts and all Puerto Rican girls were hookers?
A   Yes.
Q   And he said that in front of Bill Sakkinen, didn't he?
A   Yes...
Q   But you remember Ronald Mansfield also saying that all Puerto Ricans fought with knives?
A   What's that?
Q   That they fought with knives?
A   Yes.
Q   And you were upset when he said that, weren't you?
A   Yes, and he said that Puerto Ricans are slaves.
Q   He said they were good slaves, didn't he?
A   Bad.
Q   He said they were bad slaves?
A   Yes.
Q   And did he say that to you?
A   To all of them, me, Suma.
Q   And he also said it to Luis?
A   Luis, and I don't know who else, the other name
...
Q   And Roger Freeman also called you a slave, is that correct, or he would call Luis a slave?
Mr. MCConnel: Objection.
A   Yes, sometimes when he's mad or something happened like he doesn't want to do something sometimes in shipping and he sees somebody or hears somebody, Suma or Luis, he started calling him that stuff.
Q   What was that stuff, a slave?
A   Slave.
Q   That was Roger Freeman?
A   Yes.
Q   And when he called you a slave, how did that make you feel?
A   I feel bad, but I did not do anything.
Q   And do you remember people spreading rumors that they saw Luis kissing with a black guy?
A   Yes, I heard the rumor.
Q   Who did you hear the rumor from; who did you hear saying that rumor?
A   Everybody, everybody in the molding room.

4

**Deposition of Gretchen Rodriguez p. 29, line 20 through p. 35 line 2– Witness is asked to read Exhibit 2, which is purportedly the Sworn Statement of Gretchen Rodriguez. Note: she could barely read - much less understand - the words**

A    My name is Gretchen Rodriguez and I'm currently employed at HH, and I worked with Luis Pedraza while he was employed there. I understand that LP has complained against Dennis DeMuelle.
Q    What was the word that you just read? I understand that Luis Pedraza has made what?
A    Claim
Q    What is claim; what does that mean; do you know what that word is?
A    No.
Q    You don't
A    No.
Q    Keep on reading
A    Against Dennis DeMuelle. That is not true, for instance.
Q    Is that "for instance" or "for assistance?"
A    I don't know. Instance?
Q    Okay. Keep on reading.
A    Luis claimed that Dennis DeMuelle told him that there was a black guy on the – Luis claimed that DeMuelle said that there was a black guy on the phone and began laughing at him.
Q    Is that "logging," or "laughing" at him. Did you write that?
A    This isn't my letter.
Q    This is not something that you wrote?
A    No.

Q    Did you understand what you just read?
A    A little bit.

Q    Okay can you read the next sentence.
A    It was Luis who was constantly making statements about being gay. Luis would tell temporary employees who were there that he was gay and then he asked them if they wanted to try him.

Q    He didn't say that, did he?
A    No.

Q    You didn't write any of this stuff, did you?
A    No.
Q    Somebody gave you this thing and they said sign it?
A    Yes.
Q    It says here, "For instance, on one occasion Dennis was in the break room, Luis went up to him and said he was gay and asked Dennis if he wanted to fuck him."…
Q    Luis never walked up to Dennis and asked Dennis if he wanted to fuck him; you never heard Luis say anything like that?
A    No.

**[Deposition Testimony of molding supervisor, Dennis DeMuelle p. 59 et seq.]**

Q    There is another incident Luis Pedraza describes around February 20th of 1996. He claims that he had a meeting with Mr. Arguilla and Cindy Mohan, and he said to them around February 16th of 1996, he was going to the bathroom and that he bumped into you, or that you were following him to the men's room, and that when he went to the urinal, you told him, "Don't look at my dick." Did you ever say that to him?
A    I did say that...
Q    You didn't say anything about that incident in the affidavit that you prepared; is that correct?
A    That's correct.
Q    Why did you say that; why would you say something like that?
A    He was looking at me up and down.
Q    Was he upset at you when he was looking at you?
A    He was smiling and looked at me like this, up and down.
Q    So you told him exactly what?
A    Don't look at my dick.
...
Q    Did he report this to Bill Sakkinen?
A    I don't know.
Q    Did Cindy Mohan or Mr. Arguilla speak with you about this incident?
A    Yes.
Q    What did they say to you?
A    They asked me what happened, and I told them, and they said it was wrong for me to have said that, that I should have reported it instead of saying something.
Q    Would you happen to know why there was no mention in your personnel file about that incident?
A    No.
Q    Do you know if you were given a written warning?
A    No, I wasn't. Warning for -- being offended?
Q    Mm-hmm, for using foul and abusive language?
A    No.
Q    Did they say to you they're giving you this warning, or did they say don't do this again?
A    They said this is a verbal warning.
Q    And did they write anything in the personnel file, in your personnel file?
A    Not that I'm aware of.

**[Deposition Testimony of co-worker Ronald Mansfield at p. 31 line 5 through p. 33 line 4]**

Q    What type of joking would take place?
A    I don't know. Luis called me a "fucking Puerto Rican," joking, and Roger would jump in and we'd tease Roger, and that was it. It wasn't real. It was just joking, just the way we got along. It was the atmosphere. I believe that's what I would call it.
Q    You think it was a good atmosphere?
A    No, I took my work home, and my wife didn't like it.
...
Q    Do you have a memory, as you sit here today, of Mr. Pedraza calling you a fucking Mexican?

7

A. Not really.
Q How is it that that though came into your mind?
Mr. McConnell: I'm going to advise you, if it has anything to do with the discussion between you and I, don't answer the questions. Otherwise, you can answer the question, if you know.

A No, I don't remember.
...
Q Did you ever have an incident with Theresa Pillman where you called her a fucking bitch or whore?
A I think I had an incident with her, but I don't recall what I said, I really don't.
Q You can't recall if you said those specific words?
A No, I can't.
Q Did you ever hear anybody calling Luis a fucking slave or a fucking Puerto Rican?
A No, if it was said, I might have said it joking-wise or something, but I don't recall. To me it was all fun and games.

## Applicable Law

42 U.S.C. § 1981a. Damages in cases of intentional discrimination in employment (a)

Right of recovery (1) Civil rights provides as follows:

> "In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-5, 2000e-16) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act (42 U.S.C. § 2000e-2, 2000e-3, 2000e-16), and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent." Id.

Fed. R. Civ. P. 37 Failure to Make or Cooperate in Discovery; Sanctions provides:

(a) Motion for Order Compelling Disclosure or Discovery.

A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling disclosure or discovery as follows:

(1) Appropriate Court.

An application for an order to a party shall be made to the court in which the action is pending. An application for an order to a person who is not a party shall be made to the court in the district where the discovery is being, or is to be, taken.

8

(2) Motion.

(A) If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action.

(B) If a deponent fails to answer a question propounded or submitted under Rules 30 or 31, or a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a), or a party fails to answer an interrogatory submitted under Rule 33, … the discovering party may move for an order compelling answer, or a designation, or an order compelling inspection in accordance with the request. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action…

(3) Evasive or Incomplete Disclosure, Answer, or Response.

For purposes of this subdivision an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond.

(4) Expenses and Sanctions.

(A) If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

**Argument**

1. <u>Plaintiff is entitled to the requested information because defendants' financial information is necessary to calculate punitive damages – a remedy explicitly provided for in a Title VII case such as this.</u>

On September 14, 2000, counsel for the plaintiff propounded upon defendants the following interrogatory:

1. "Please identify the amount of your income as reported on state and federal income tax returns including all schedules and W-2 forms for the following years: 1995 to the present."

9

On November 16, 2000, defense counsel Joseph P. McConnell replied as follows:

Answer

"Defendants object to each of these identical interrogatories served on each defendant because they are irrelevant, overly broad, unduly burdensome, and not otherwise calculated to lead (sic.) the discovery of relevant information. Defendants further object to these interrogatories because they seeks (sic.) private information about parties that is not in any manner relevant to this action and are designed merely to be vexatious and harassing of the individual defendants. Defendants further object to these interrogatories because they (sic.) vague and ambiguous since Defendant Holiday Housewares, Inc. is not an employee of any entity that subject it to received (sic.)an I.R.S. Form W-2."

It is plaintiff's contention that this confusing objection is frivolous and not taken in good faith. Whether there exists a "factual basis for a punitive damage claim" is by definition a job for the finder of fact, not defense counsel. Plaintiff does not want to find himself at the damages phase of trial, having to tell the judge, "Sorry, your honor, but we need a break in the proceedings until the financials are provided before we can proceed" – preposterous. There is a real likelihood a jury will find defendants actions/inactions warrant a finding of punitive damages. Defendants' financial records are clearly discoverable, as they are reasonably calculated to lead to the discovery of admissible evidence. Such records will be used to calculate plaintiff's punitive damage request. Mr. McConnell knows this.

It is unlikely this case will be bifurcated into liability and damages phases. It would constitute a waste of judicial resources if the trial judge demands that counsel for the plaintiff be ready to lead into the punitive damages aspect of the case. If plaintiff is not allowed to obtain the requested tax information, plaintiff's counsel will be caught unprepared to address the punitive damage question. In addition, there is the potential for committing malpractice if all necessary information for calculating punitive damages has not been requested before trial.

**Conclusion**

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court allow this motion to compel defendants to answer financial interrogatories propounded by the plaintiff and order payment of such sanctions as the court deems appropriate.

## Rule 37.1 Certification

Counsel Hector Pineiro for plaintiff and Joseph McConnell for defendants conferred on 12/13/00 to resolve whether this single interrogatory was appropriate, in accordance with F.R.Civ. P. 37 (2)(A), and Local Rule 37.1. Counsel were unable to resolve this dispute.

Respectfully submitted,
Plaintiff
By attorneys,

_____
Hector E. Pineiro, Esquire, BBO # 555315
Robert H. Beadel, Esquire, BBO # 632447
800 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

**CERTIFICATE OF SERVICE**
I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH PARTY BY MAIL (BY HAND) ON: _____

11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIS A. PEDRAZA,<br>    Plaintiff<br><br>v.<br><br>HOLIDAY HOUSEWARES, INC.,<br>DOUGLAS BINGHAM,<br>MARCO ARGUILLA, CINDY MOHAN,<br>WILLIAM SAKKINEN &<br>DENNIS DeMUELLE,<br>    Defendants | Civil Action No. 99-40030-NMG |

## ORDER

This action came before the Court upon the motion of the Plaintiff to compel an answer to interrogatories pursuant to the provisions of F. R. Civ. P. 33 and 37(a) and local Rule 37.1. Thereupon in consideration thereof it is ORDERED AND ADJUDGED:

\_\_\_\_ The Court grants plaintiff's motion to compel defendants to answer financial interrogatories, for the period 1995 to the present. Each of the defendants is ordered to answer the interrogatory no later than _____.

_____, J.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIS A. PEDRAZA,<br>    Plaintiff<br><br>v.<br><br>HOLIDAY HOUSEWARES, INC.,<br>DOUGLAS BINGHAM,<br>MARCO ARGUILLA, CINDY MOHAN,<br>WILLIAM SAKKINEN &<br>DENNIS DeMUELLE,<br>    Defendants | Civil Action No. 99-40030-NMG |

## AFFIDAVIT OF ROBERT H. BEADEL

1. I am an attorney duly licensed to practice before all courts of the Commonwealth of Massachusetts.

2. On or about November 3, 2000, I spoke with attorney Joseph McConnell about providing an answer to interrogatories propounded to defendants, seeking financial information. Attorney McConnell informed me he would be objecting to the interrogatory.

3. On November 6, 2000, I wrote to attorney McConnell confirming the fact he would object to the interrogatories propounded rather than provide an answer.

4. On November 16, 2000, defendant provided his objection.

5. I truly believe plaintiff is entitled to the financial records of the defendants as sought by interrogatory because of the very plausible finding of punitive damages against the defendants.

6. In addition, plaintiff contends that the defense objection that the interrogatory to Holiday Housewares is vague and ambiguous is not well taken when defense counsel, through conversation with plaintiff's counsel, knows what plaintiff seeks – financial information from Holiday Housewares from 1995 to present.

Sworn and subscribed under the pains and penalties of perjury this 27th day of November, 2000.

_____
Robert H. Beadel, Esquire

13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIS A. PEDRAZA,<br>    Plaintiff<br><br>v.<br><br>HOLIDAY HOUSEWARES, INC.,<br>DOUGLAS BINGHAM,<br>MARCO ARGUILLA, CINDY MOHAN,<br>WILLIAM SAKKINEN &<br>DENNIS DeMUELLE,<br>    Defendants | Civil Action No. 99-40030-NMG |

## AFFIDAVIT OF HECTOR E. PINEIRO

1. I am an attorney duly licensed to practice before all courts of the Commonwealth of Massachusetts.

2. On December 13, 2000, attorney Joseph McConnell and I conferred regarding the appropriateness of discovering financial records for the defendants for the period 1995 to present. We were unable to reach agreement on this issue.

Sworn and subscribed under the pains and penalties of perjury this 18th day of December, 2000.

_____
Hector E. Pineiro, Esquire