UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LUIS A. PEDRAZA,<br>    Plaintiff | )<br>)<br>) | |
| v. | )<br>)<br>) | Civil Action No. 99-40030-NMG |
| HOLIDAY HOUSEWARES, INC.,<br>DOUGLAS BINGHAM,<br>MARCO ARGUILLA, CINDY MOHAN,<br>WILLIAM SAKKINEN &<br>DENNIS DeMUELLE,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>) | DOCKETED |

**PLAINTIFF'S SEPARATE PRETRIAL MEMORANDUM**

1. <u>Concise summary of the evidence to be offered as to liability and damages</u>

    This is an action brought alleging discrimination based on National Origin/Ancestry, to wit, Puerto Rican, for harassment on the basis of perceived sexual orientation ("homosexual"), and for retaliation upon filing a complaint to the Massachusetts Commission Against Discrimination and for unlawful discharge. The plaintiff seeks damages, costs and reasonable attorney fees. Plaintiff alleges he was hired at Holiday around August of 1995, and some time in October 1996, and continuing, he became the victim of discriminatory acts by supervisors and co-workers.

    Plaintiff alleges the defendant Douglas Bingham, production manager in the molding department, and plaintiff's supervisor, began to tell him and others that the plaintiff was gay. Mr. Pedraza complained to his direct supervisor William Sakkinen, but nothing was done. Pedraza alleges that Bingham and supervisor Dennis DeMuelle continued to spread rumors that they had seen plaintiff kissing a black man. Pedraza alleges that DeMuelle, kept inquiring whether Luis was gay, and whether he liked men or women. In January 1996, Pedraza and other co-workers were called "fucking Puerto Ricans" and told "Puerto Ricans were drug addicts," and "Puerto Rican women were hookers that fought with knives." Puerto Ricans were also "slaves." These remarks were made in front of a supervisor. He took no actions on these comments.

Pedraza alleges that while two individuals were disciplined for their comments, for foul and abusive language (Goss & Mansfield) when Pedraza requested assistance from the plant manager Marco Arquilla, and Cindy Mohan, director of human resources, he was told they were not interested in complaints he had pertaining to that incident. On February 5, 1996, Pedraza complained to the MCAD. As soon as he filed his complaint of discrimination, Arquilla and Mohan informed Pedraza he did not have to go to the MCAD. Pedraza alleges that Mohan informed him that her brother was also gay and he was "a very nice person" – a fact not denied by Mohan or Arquilla. The plant manager, Arquilla, told Pedraza that the plant had a Spanish fellow at one of their plants who was a "maricon" – (a derogatory term for a homosexual) that he would touch his buttocks and that didn't bother him. Pedraza alleges, and it's undisputed that co-workers gave him a sanitary tampon with the following engraving "For Luis with Great Admiration, Your Fans." Mohan and Arquilla pressured Pedraza into dropping his Complaint for discrimination and were upset by his refusal to do so.

Plaintiff alleges that in the interim other incidents of discrimination occurred, that he reported these incidents to his supervisor, and nothing was done. Mohan and Arquilla do not deny that they asked Pedraza to drop his complaint of discrimination.

The plaintiff was absent from work from March 15, 1996 through April 22, 1996, secondary to a surgical procedure which incapacitated him from work. On April 22, 1996 the plaintiff was informed by William Sakkinen that he could not return to work until he got clearance from the nurse at Plastican, Inc. The plaintiff spoke with the nurse who informed him that he could do light duty work. On April 22, 1996 the plaintiff felt sick and felt like throwing up. As the plaintiff walked to the men's room he was followed by his supervisor the defendant William Sakkinen and Mark Fontaine the Production Manager at Holiday Housewares, Inc., who were curious if Mr. Pedraza was actually throwing up. The plaintiff was told by Mark Fontaine said that even if he was sick he could use his hands. The plaintiff was ultimately told by the shift nurse to go home and the plaintiff went looking for his brother to pick him up.

Before he left work the plaintiff went to the molding room to ask a co-worker, Rebecca Carrion if she had an aspirin because of his physical symptoms. When the plaintiff got to the molding room, he encountered Dennis DeMuelle who said to the plaintiff that he did not want him in the molding department. When the plaintiff asked Dennis DeMuelle why he could not go

to the molding department to ask a co-worker for an aspirin, DeMuelle replied the defendant replied "I don't want you here, faggot!" As a result of the continuous harassment by Mr. DeMeulle and his offensive and demeaning conduct, the plaintiff swore at the defendant. Immediately after the incident of with DeMuelle, the plaintiff called Felicia Huard, Human Resource/Payroll Manager at Plastican, Inc., to complain about the conduct of Mr. DeMuelle. The plaintiff was told by Ms. Huard that she had also spoken with Mr. DeMuelle and that she would believe Mr, DeMuelle version of the events. She made no investigation to find out if Mr. DeMeulle had in fact called Pedraza a "faggot". Ms. Carrion testified that DeMeulle said a "bad" word which made Pedraza upset. Felicia Huard also informed the plaintiff that Cindy Mohan's response would be the same as hers. Huard has admitted in her deposition that had she been informed that DeMeulle called Pedraza a "faggot" it would have had a bearing on her decision to fire and that she would have issued a "heavy warning" to DeMeulle. Ms. Huard was aware that Pedraza had pending charges against Holiday Housewares, Inc., at the MCAD. Moreover, Ms. Huard admitted that there was no policy at Holiday Housewares, Inc., calling for a dismissal of an employee for the first instance of abusive language.

While speaking to Felicia Huard from an office located at Holiday Housewares, Inc., the plaintiff could hear Dennis DeMuelle laughing and talking loud with another person. The plaintiff reasonably believed at the time that it was Dennis DeMeulle calling his name and upset at the situation walked away and said that he did not want to speak with him. On April 23, 1996 the plaintiff was fired from his job at Holiday Housewares, Inc. under the pretense of using foul language – a behavior which did not result in termination of other employees – Plaintiff's exhibit list includes Mark Goss' employee file which shows multiple warnings for offensive language without termination. Notably, Felicia Huard testified at her deposition she was unaware that Pedraza's use of foul language was in response to being called a faggot.

**Damages:**
Hernando Romero, M.D. is a Diplomate of the American Board of Psychiatry and Neurology. In addition to taking a history from Mr. Pedraza, he examined Mr. Pedraza on April 22 and May 18, 2000, and he reviewed the following documents:

1- Affidavit of Luis Pedraza dated June 28, 1996.
2- Affidavit of Dennis DeMuelle, dated December 22, 1997.
3- Affidavit of Marcello Rodriguez, dated November 7, 1996.
4- Affidavit of Gretchen Rodriguez, dated October 24,1996.
5- Statement written by the attorneys representing Holiday Housewares, dated April 25, 1996 and signed by Jeff Thompson from Haynsworth, Baldwin, Johnson and Harper.

Dr. Romero will testify that Mr. Pedraza feels "humiliated, angry, upset, agitated, nervous, insomniac, dreaming all the time with the same problem". He is exhausted and tired of being rejected on account of poor recommendations from his former employer. Dr. Romero will testify that Mr. Pedraza has felt very anxious, rejected, worthless, restless, depressed in his mood and disoriented in life. He cannot sleep well because he constantly dwells on what happened at the factory and because he suffers from nightmares in which everybody accuses him and tells him he will never be able to find work ever again or that wherever he goes they will follow him. He is anhedonic, unable to enjoy life and happy events or experiences as he did before.

Dr. Romero will testify that Mr. Pedraza reported he cries on occasion, feels very depressed and wishes to die. He has also been very angry for the destruction of his working life and his future. He has lost all respect for himself because he cannot work now. He needs to take analgesics almost every day because he suffers from headaches and multiple other pains that he believes are psychogenic in origin. He has lost his appetite and 4 pounds of his weight over the past few weeks in anticipation of the court procedures and the fact that he will have to revive his experiences in his last job. He feels very scared when thinking of going back to work where he can be abused once more. He also is very embarrassed because he thinks many people know about the lies and might think they are true. When he sweeps the floor in his house he shakes all over because that was the job he did at work. Then he revives his painful memories. He does not drink alcohol beyond social levels, does not smoke cigarettes or use any other drugs or substances. He has no history of previous psychiatric illness or treatment.

Dr. Romero will testify that Mr. Pedraza sat at the edge of the chair and turned hyperactive and restless with high degree of anxiety while telling of his traumatic experiences at his last job. He spoke with a high pitched tone of voice and the speed of his association of ideas was increased due to elevated anxiety levels. He was lucid, well oriented in all spheres and well preserved in his intellectual functions. He came across as an honest and credible person, yet somewhat naive and structured within the traditional social patterns of his culture in which respect for authority figures and love for his coworkers stand out.

Dr. Romero will testify that Mr. Pedraza displayed good memory functions and repeated his story several times in different ways but always presenting the same set of events and circumstances. He described his symptoms sometimes repeating himself and spoke of his nightmares, insomnia, emotional pain from his experiences at work and the rejections from potential jobs, cried in occasions and verbalized his fears of never being able to get employed again. Although his affective response was mostly anxious, he also displayed depressed mood and a pessimistic view of the future.

Dr. Romero will testify that Mr. Pedraza thinks he no longer is the person he once was because he now cannot trust any body, feel the joy of life, enjoy his friends and frequently is invaded by anxiety resulting from the recapitulation of his traumatic memories at work or by situations that indirectly duplicate them in his daily life. He denied delusional, hallucinatory, obsessive compulsive or phobic components to his thinking.

## DIAGNOSIS

Dr. Romero will testify that based on the history and documentation provided as well as the clinical examination findings that revealed a history of repeated traumatic experiences at work, rejection from other jobs, insomnia, avoidance of situations resembling or associated to the traumatic events, recurrent and intrusive distressing recollections of the events, recurrent distressing dreams of the event, feeling of detachment or estrangement from others, restricted range of affect, irritability, angry outbursts, pessimistic attitude towards his future and significant distress in his occupational, social and emotional lives, Mr. Pedraza meets criteria for the following psychiatric diagnosis (DSM4, American Psychiatric Association),

| | |
|---|---|
| Axis I | Post Traumatic Stress Disorder with Adjustment Disorder with Mixed Emotions. |
| Axis II | No Diagnosis. |
| Axis III | HIV(+) Status Post multiple hernia surgical interventions. |
| Axis IV | psychosocial factors aggravating Axis I: Multiple traumatic experiences in his last job, loss of employment and income, multiple rejection in prospective jobs, absent psychiatric and work environment support. |
| Axis V | Global Assessment of functionality (1 to 100) 50. |

## CAUSALITY

Dr. Romero will testify that the above diagnosis is causally related to the events taking place in Mr. Pedraza's job between the months of August 1995 and April 1996.

IMPAIRMENT

Dr. Romero will testify that according to the American Medical Association guidelines of impairment that classifies impairment in 5 different categories namely none, mild, moderate, marked and extreme, Mr. Pedraza suffers from marked impairment levels which means that Mr. Pedraza's impairment levels preclude most productive functions.

CAPACITY TO WORK

Dr. Romero will testify that Mr. Pedraza is not able to perform gainful work. His disability will remain total and permanent for the present and foreseeable future.

TREATMENT

Mr. Pedraza does not receive treatment for his psychiatric condition. Dr. Romero will testify that treatment is appropriate and necessary in order to diminish psychological pain, lower the intensity of his symptoms and prepare him for rehabilitation.

## DAMAGES GENERALLY AVAILABLE IN A DISCRIMINATION CASE

- Damages available include actual, punitive damages and fees and costs - "The broad remedial provisions of c. 151B, Section 9, ...include 'actual and punitive damages' and 'reasonable attorney's fees and costs...'" Pielech v. Massasoit Greyhound Inc. 47 Mass. App. Ct. 322 (1999)

- "The commands of G.L. c. 93A, Sections 9(4) & 11, and G.L.c.151B, Section 9, that a court finding for a petitioner 'shall,' in addition to other relief award 'reasonable attorney's fees and costs,' are sufficiently similar.. to persuade us that post judgment interest on trial attorney's fees should be assessed in discrimination cases." Cheryl Nardone v. Patrick Motor Sales. Inc. 46 Mass. App. Ct. 452 (1999):

- Punitive damages and post-judgment interest - "We conclude the plaintiff here similarly is entitled to post judgment interest on the punitive damages award." Cheryl Nardone v. Patrick Motor Sales Inc. 46 Mass. App. Ct. 452 (1999):

- "Under G.L.c.151B, Section 9 (1992 ed.), the plaintiff may seek both legal and equitable remedies for violations of G.L.c. 151 B, Section 4. If the plaintiff prevails, she may recover monetary damages for her economic losses as well as for mental anguish. See College Town. In egregious cases, the statute also provides the legal remedy of punitive damages. See G.L.c. 151 B, Section 9. The statute clearly affords the plaintiff the legal remedy of compensatory damages. Conway v. Electro Switch Corp., 402 Mass. 385, 387 (1988)." Dalis v. Buyer Advertising, Inc. 418 Mass. 220,225 (1994).

2.  **Statement of facts as established by pleadings, Admissions or Stipulation**

    Plaintiff was hired by Holiday Housewares in August 1995 in shipping.

    On February 5, 1996, Plaintiff filed his initial charge of discrimination with the Massachusetts Commission Against Discrimination.

    On April 22, 1996, plaintiff returned to work after several weeks of medically authorized leave.

    At the Deposition of Holiday Employee Gretchen Rodriguez, the witness was asked to read a document which was purportedly her own sworn statement. The statement was obviously created to suggest to the MCAD that Pedraza did not mind on the job harassment. Note: It was telling that she could barely read -much less understand what she had purportedly written- the words:

7

Deposition of Holiday employee Gretchen Rodriguez p. 29, line 20 through p. 35 line 2

A     "My name is Gretchen Rodriguez and I'm currently employed at HR, and I worked with Luis Pedraza while he was employed there. I understand that LP has complained against Dennis DeMuelle."
Q     What was the word that you just read? I understand that Luis Pedraza has made what?
A     Claim
Q     What is claim; what does that mean; do you know what that word is?
A     No.
Q     You don't
A     No.
Q     Keep on reading
A     Against Dennis DeMuelle. That is not true, for instance.
Q     Is that "for instance" or "for assistance?"
A     I don't know. Instance?
Q     Okay. Keep on reading.
A     Luis claimed that Dennis DeMuelle told him that there was a black guy on the - Luis claimed that DeMuelle said that there was a black guy on the phone and began laughing…
**Q**     **Is that "logging," or "laughing" at him. Did you write that?**
**A**     **This isn't my letter.**
**Q**     **This is not something that you wrote?**
**A**     **No.**
Q     Did you understand what you just read?
A     A little bit.
Q     Okay can you read the next sentence.
A     It was Luis who was constantly making statements about being gay. Luis would tell temporary employees who were there that he was gay and then he asked them if they wanted to try him.
**Q**     **He didn't say that, did he?**
**A**     **No.**
**Q**     **You didn't write any of this stuff, did you?**
A     No.
Q     Somebody gave you this thing and they said sign it?
**A**     **Yes.**
Q     It says here, "For instance, on one occasion Dennis was in the break room, Luis went up to him and said he was gay and asked Dennis if he wanted to fuck him."…
Q     Luis never walked up to Dennis and asked Dennis if he wanted to fuck him; you never heard Luis say anything like that?
A     No.

     Cindy Mohan (Sierra) does recall that Ronald Mansfield was warned and eventually terminated from Holiday Housewares for foul language (though it wasn't one or two occasions as sufficed for Mr. Pedraza). Deposition of Cindy Sierra at p. 29 line 6 through p. 30, line 10.

Before 1996, there was no written policy at Holiday regarding sexual harassment, and Mohan could not explain how employees and supervisors were supposed to know what constituted illegal behavior. Deposition of Cynthia Sierra at p. 40, lines 1-17. Holiday came up with a sex harassment policy only after plaintiff filed his MCAD Complaint. Deposition of Marco Arquilla p. 77. Ms. Mohan explained that she saw no difference between an employee using racial epithets and foul language!

During a February 13, 1996, meeting the plaintiff asked Ms. Mohan and Arguilla to bring Douglas Bingham and Dennis DeMuelle to the office because he wanted sexual jokes and harassment to stop and Cindy Mohan told the plaintiff she would not agree to do so. Sierra does not dispute that Pedraza complained of the tampon incident and was upset by it.

Deposition of Cynthia Sierra at p. 96, line 17-20; and p. 97
Q       Did another worker tell you that she had given a – did Luis tell you somebody had given him a tampon, a sanitary tampon?
A       Yes.
Q       So he wasn't laughing when he told you that a coworker had given him a tampon?
A       No.
Q       He was disturbed, was he not?
A       Yes.

Deposition of Douglas Bingham at p. 42, line 8-18
Q       Did you ever hear that some employees circulated a tampon that they gave to Luis as a souvenir?
A       Only in the initial suit.
Q       After Luis was fired, did you ever speak with Marco Arquilla about Luis Pedraza?
A       We may have discussed the situation, yes.
Q       How did you discuss the situation?
A       Well, we may have discussed how things got to where they were and what we can do to prevent something like that was from happening in the future.

The deposition testimony of Mr. Pedraza's molding supervisor, Dennis DeMuelle, p.59 et seq. shows Pedraza was harassed and was not joking:

Q       There is another incident Luis Pedraza describes around February 20th of 1996. He claims that he had a meeting with Mr. Arguilla and Cindy Mohan, and he said to them around February 16th of 1996, he was going to the bathroom and that he bumped into you, or that you were following him to the men's room, and that when he went to the urinal, you told him, **"Don't look at my dick." Did you ever say that to him?**
A       **I did say that...**
Q       **You didn't say anything about that incident in the affidavit that you prepared; is that correct?**
A       **That's correct.**
        ...
Q       **Did Cindy Mohan or Mr. Arguilla speak with you about this incident?**
A       **Yes.**

9

**Q      What did they say to you?**
**A      They asked me what happened, and I told them, and they said it was wrong...**

Cindy Mohan/Sierra has conceded that Pedraza had reported to her in the past that others were calling him gay, even though he was not. She concedes that Luis was disturbed at being given a tampon by a supervisor. Deposition of Cindy Sierra at p.97 lines 9-10. She also admitted that there were people in the company spreading rumors that Luis was gay. Mark Fontaine the production and materials manager at Holiday Housewares, Inc., also testified that one of Pedrazas' tormentors, Douglas Bingham the molding room manager disliked gay people.

Q:      Mr. Bingham told you at some point in time that he does like Luis Pedraza?
A:      I believe it came up.
Q:      Because he thought he was gay? [pp. 54]
A:      I don't know that he used those specific words, but something to that effect.
Q:      What specific words did he use; queer, fagot, f[p]ancy?
A:      It was an inference to someone being gay. I don't remember the exact words.
Q:      A sissy, is what he told you; is that correct?
A:      I honestly don't remember the words.
Q:      But they were words to that effect?
A:      They were inference to the fact that he was gay.
Q:      You had heard Mr. Bingham, Mr. Bingham told you, putting aside Luis Pedraza, that he didn't like gay guys, is that correct?
A:      I heard that. [pp. 54]
Q:      He thought that they didn't belong in his department; he didn't want to be associated with them; isn't that a fact?
A:      I gathered from the nature of saying that, he didn't like gay people, that he didn't like to associate with them.
Q:      He didn't like working with them?
A:      Well, that would be associating with them, I guess.

Mr. Fontaine testified that DeMeulle admitted to having made disparaging remarks to Pedraza *before* Pedraza had said "fuck you" and that he had heard other people say Pedraza was a faggot.

3.  Contested Issues of Fact

   Whether Luis Pedraza was discriminated against on account of national origin discrimination;
   Whether Luis Pedraza was sexually harassed on account of perceived sexual orientation;
   Whether Luis Pedraza was subjected to retaliatory termination.

4.  Jurisdictional Questions

Respectfully, and despite a recent ruling, whether U.S. District Court has Jurisdiction over this case of discrimination, comprised solely of State Claims (All Federal Claims were dismissed).

5. Questions raised by pending motions

N/A. It should be noted that plaintiff will oppose the motions in limine alluded to in Defendants' Pretrial Memorandum.

6. Issues of law

## STATUTORY DISCRIMINATION LAW

CHAPTER 151B. UNLAWFUL DISCRIMINATION BECAUSE OF RACE, COLOR, RELIGIOUS CREED, NATIONAL ORIGIN, ANCESTRY OR SEX provides as follows:

M.G.L. c. 151B. Section 1. Definitions.

"18. The term **"sexual harassment"** shall mean sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or **effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment** Discrimination on the basis of sex shall include, but not be limited to, sexual harassment." Id.

G.L. c. 151B Section 4. Unlawful practices.

Section 4. It shall be an unlawful practice:

"1.     **For an employer, by himself or his agent, because of** the race, color, religious creed, **national origin,** sex, **sexual orientation,** which shall not include persons whose sexual orientation involves minor children as the sex object, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or **to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."** Id.
...
16A.   **For an employer, personally or through its agents, to sexually harass any employee."** Id.

Plaintiff also contends defendants interfered with the plaintiff's right to be free from unreasonable, substantial, or serious interference with privacy, as stated in G.L.c. 214 § 1B.

## CASE LAW INTERPRETING THE STATUTE

11

- A claim alleging sexual harassment, as defined in M.G.L.c. 151B, Section 1, and prohibited by Section 4(16A), is permissible without reference to the question of gender or sexual orientation of the alleged harasser. Melnychenko v. 84 Lumber Company, 424 Mass. 285 (1997). "The principal issue in this case is whether same-sex sexual harassment is prohibited by G.L.c. 151B, § 4 (16A), regardless of the sexual orientation of the parties. We agree with the trial judge that such conduct falls within the statutory definition of sexual harassment, and is, therefore, prohibited by G.L.c. 151B, § 4 (16A)." Id.

- Allegations of homosexuality qualify - "Harty's comments, occurring within one week after Belanger's return to work, concerned Belanger's sexual orientation and are therefore unequivocally of a sexual nature" Belanger v. Saint-Gobain Industrial Ceramics, No. 951767B (Feb.24, 1999)

- Objective and subjective standards - "In determining whether the [employer's] conduct was of such a nature that it [interfered with the plaintiff's work environment, we view the evidence of harassment from the view of a reasonable person in the plaintiffs position." Gnerre, 402 Mass. at 507 (emphasis added). This standard requires a fact finder to view the harassment from both objective and subjective perspectives. It is manifest from the evidence introduced at trial that Belanger subjectively believed that Harty's comments were offensive and intimidating, the question then remains whether Belanger presented sufficient evidence which would warrant an objectively reasonable person ift believing that his workplace was hostile." Belanger v. Saint-Gobain Industrial Ceramics, No. 951767B (Feb.24, 1999)

- Single occurrence will suffice - "It has recently been held that a single occurrence of sexual harassment from the perspective of the victim, can be sufficient to create a hostile environment." Albee v. New England Medical Center Hospitals, Inc. & Another, 7 MASS. L. RPTR. 593,. 1997 WL 691524 (Mass. Super 1997).

- Strict Liability - "Massachusetts adheres to a 'strict liability' standard with regard to harassment by supervisors. See College-Town, 400 Mass. 156 (1987)." Belanger v. Saint-Gobain Industrial Ceramics, No. 951767B (Feb.24, 1999), a recent Superior Court case.

* Same sex sexual harassment in workplace held actionable as sex discrimination under the provisions of Title VII of the Civil Rights Act of 1964 (42 USC, ss. 2000e-2(a)(1)), Oncale v. Sundowner Offshore Services, Inc., 523 U.S.--        , 140 Led 2d 201, 118 S Ct- (1998)(Case Number 96-568)

One of the seminal cases in Massachusetts applying 151B to sexual harassment is College Town Div. Of Interco, Inc. v. Massachusetts Commission Against Discrimination, 400 Mass. 156, 163-168 (1987). The College-Town case involved a plaintiff who was hired to a clerical position at College-Town.

After being hired her supervisor began making sexually suggestive comments to her ("You have a sexy voice on the phone" and "You have a sexy walk") He placed his hand on her

back and said, "Boy, you have a firm back for a broad your age." On another occasion he covered the slit in a dress, and said, "Fix your skirt." On another occasion he said, "I liked the way your tits stood out in the red shirt." The results:

> Employer was vicariously liable under G.L.c. 151B, § 4, for the conduct of one of its supervisors, who, by a pattern of objectionable conduct during a period of several months, had created a sexually harassing work environment for an employee under his supervision.
>
> Employer had discriminated against one of its employees by failing to take adequate remedial steps after she complained of sexual harassment by her supervisor. [167-168].
>
> Court also upheld an award of back pay to an employee who was found to have been discharged in retaliation for her claim of sexual harassment by a supervisor.
>
> The Court also held the MCAD "properly awarded damages for the emotional distress suffered by an employee who was found to have been subjected to sexual harassment by her supervisor and to have been discharged in retaliation for her having filed a complaint with the commission. [169]
>
> The Massachusetts Commission Against Discrimination, in an award of damages under G.L.c. 151B, § 5, in an employment discrimination proceeding did not err in including interest from the time the proceeding was commenced. [169-170]

7. Any requested Amendments to the Pleadings

   None.

8. Additional matters to aid in disposition of action

   None.

9. Probable length of Trial and whether jury or non jury

   Plaintiff estimates four to five days if afforded full-day sessions.

10. Trial Witness

    Factual Testimony:

Zulma Rosado
PO Box 1182
Adjuntas, P.R. 00601

Joseph Kutoch
132 Snow Street

Fitchburg, MA

Jean C. Suave
100 Main St
Leominster, MA

Luis Pedraza
313 Lancaster St, #3
Leominster, MA

Alberto Pedraza
313 Lancaster Street # 3
Leominster, MA

Douglas Bingham
Westminster, MA

Felicia Huard
C/o Plastican, Inc.
84 Winter Street
Fitchburg, MA

Cindy Sierra/Mohan
25 Century Way
Gardner, MA 01440

Bill Sakkinen
51 Cashman Hill Rd
Ashburnham, MA 01430

Marco Arquilla
72 Judy Dr.
Leominster, MA 01453

Mark Fontaine
12 West End Ave.
Gardner, MA 01440

Dennis DeMeulle, Jr.
22 Adams St.
Apt. 9
Fitchburg, MA 01420

Gretchen Rodriguez

125 Adams St, #2
Leominster, MA 01453

Marcello Rodriguez
63 Walnut St
Leominster, MA 01453

Roger Freeman
20 Newton Street
Leominster, MA 01453

Laura Peguero
17B Crossman Ave.
Leominster, MA 01453

Ron Mansfield
32 Columbia Street
Ayer, MA

Mark Goss
46 Granite Street, #3
Fitchburg, MA

Rebecca Carrion
330 Kimball St
Fitchburg, MA

Louise Clinch
40 Heritage Lane
Leominster, MA

Sam Clementi
196 Industrial Rd.
Leominster, MA

Deanna Zarella
Human Resources
Holiday Housewares
Leominster, MA

Keeper of the Records of
Richard C. Paradise, Phd.
100 Erdman Way Suite 200
Leominster, MA 01453

Expert/Medical Testimony:

HERNANDO ROMERO, M.D.
30 Edward Street
Worcester, Massachusetts 01605

11. Proposed exhibits

Plaintiff proposes introduction of the following exhibits:
1. Incident report dated April 22, 1996, marked as Exhibit #2 to Mark Fontaine's deposition
2. Diagram prepared by Mark Fontaine at his deposition
3. Complaints of Discrimination marked as exhibits to Cindy Mohan's deposition
4. Employment application of, and employee warning report issued to, Ron Mansfield
5. Affidavit of Dennis DeMeulle to MCAD dated 12/22/97, marked as Exhibit 1
6. Employment application and personnel records of Dennis DeMeulle
7. Statement of Dennis DeMeulle
8. Sexual Harassment policy of Holiday Housewares dated 2/19/96, marked as Exhibit 3 to the deposition of Dennis DeMeulle
9. Affidavit marked Exhibit #2 at the deposition of Gretchen Rodriguez, alleging accusations against Luis Pedraza were false.
10. Complaint for discrimination filed by Zulma Malave against Holiday Housewares with MCAD
11. 4/25/96 letter to MCAD from Haynsworth, Baldwin, Johnson and Harper, marked as Exhibit #4 at Felicia Huard's deposition, regarding Holiday Housewares position statement in connection with Luis Pedraza's accusations
12. Mental Health records of William Sakkinen dated 3/14/96
13. Amended Complaint of Discrimination of Luis Pedraza
14. All exhibits marked at the deposition of Mark Goss, including but not limited to employee application, personnel records, employee warning dated 6/6/95, and Employee warning dated 1/30/96.
15. Sexual Harassment policy and procedure marked as Exhibit #2 to deposition of Marco Arquilla on 8/30/00
16. Memorandum to Cindy Mohan marked as Exhibit #6 at deposition of Felicia Huard
17. Employee Warning report to Ron Mansfield dated 1/26/96, and marked as Exhibit #5 to Felicia Huard's Deposition
18. 1/30/96 Employee warning report marked as Exhibit #4 to Mark Goss Deposition
19. 6/6/95 warning to Mark Goss for foul and abusive language, marked as Exhibit #2 at Felicia Huard's deposition
20. Personnel or Employee Handbook(s) at Holiday Housewares, Inc., in effect between August 1995 and April 22, 1996
21. Criminal convictions of Mark Goss in State Court, of Ronald Mansfield, of Dennis DeMeulle and Roger Freeman;
22. Mental health records of Richard C. Paradise, PhD., 100 Erdman Way, Ste. 200, Leominster, MA 01453
23. Personnel records of William Sakkinen

Respectfully submitted,
Plaintiff
By attorneys,

_____
Hector E. Pineiro, Esquire, BBO # 555315
Robert H. Beadel, Esquire, BBO # 632447
800 Main Street
Worcester, MA 01610
Tel. (508) 770-0600

## CERTIFICATE OF SERVICE

I, Robert H. Beadel, Esq., hereby certify that, on the following date, I served a copy of the foregoing document by facsimile on the counsel of record in this action. In addition, Hector Pineiro and I met with attorney McConnell to discuss all topics suggested in the Court's notice of pretrial.

VIA FACSIMILE
(617) 367-3125

Joseph McConnell
Morgan, Brown et al.
One Boston Place
Boston, MA 02108

Dated: 11/21/01

_____
Robert H. Beadel, Esq.

17